Filed 4/12/22  P. v. Darling CA3
(opinion on rehearing)

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C093492 |
| Plaintiff and Respondent, | (Super. Ct. No. 20FE006062) |
| v. | |
| DYLAN PAUL DARLING, | OPINION ON REHEARING |
| Defendant and Appellant. | |

After a jury found defendant Dylan Paul Darling guilty of second degree robbery (Pen. Code, § 211),[1] and found "true" a prior serious felony allegation, the trial court imposed a state prison sentence of 11 years. On appeal, defendant contends (1) there was insufficient evidence for his robbery conviction; (2) the trial court prejudicially erred

---

[1] Undesignated statutory references are to the Penal Code.

1

when it misread a jury instruction to the jury; and (3) the trial court erred by providing a jury instruction for which there was insufficient evidence. We affirm the convictions.

We filed an unpublished opinion affirming the criminal judgment on January 25, 2022. Defendant filed a petition for rehearing arguing Assembly Bill No. 124 (2021-2022 Reg. Sess.; hereafter Assembly Bill 124), signed by the Governor on October 8, 2021, must be applied retroactively to defendant's case under *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*). We granted rehearing, vacated our initial opinion, and ordered supplemental briefing from the parties. Having reviewed the parties' submissions, we accept their agreement that Assembly Bill 124 applies retroactively to this case and requires remand for resentencing.

## BACKGROUND

On April 6, 2020, Darryl Jackson was sitting in front of a fast-food restaurant, waiting for a take-out order, when a young woman ran up to him and asked for help. "My boyfriend is going to kill me," she said. Crying and shaking, the woman sat down next to Jackson in the outdoor tent provided by the restaurant (due to COVID-19 safety protocols). Defendant appeared moments later and addressed the woman, "Bitch, didn't I tell you to stay in the car?"

Defendant then struck Jackson on the head, and both men went to the ground, defendant on top of Jackson. The two struggled as Jackson (who was "kind of disoriented") tried to hold on to defendant "so [defendant] wouldn't hit" him again. Defendant mumbled "[l]et go of me" several times. Jackson eventually let go, and defendant departed the tent area. Surveillance video footage introduced as evidence at trial showed the two men scuffling for about 30 seconds as defendant appears to kneel on Jackson and press down on the head/neck area of Jackson with his left hand. For some of that time, defendant's right arm and right hand are not visible, as they are behind defendant's body and obscured from the surveillance camera's view.

2

As reflected in the surveillance video, about two minutes after he first walked away from Jackson, defendant returned to the restaurant's entrance and forcefully pulled and kicked at the restaurant's closed front door. Later (and outside of the surveillance camera's frame) Jackson observed defendant walk to a truck and get in.

Later still, Jackson realized his wallet was missing. He searched for the wallet on the ground where defendant attacked him and on the ground by his car. A law enforcement officer who responded to the scene found Jackson's wallet in the backseat of defendant's girlfriend's truck.

Jackson never felt defendant's hand in the front left pants pocket where Jackson kept his wallet. And defendant never said anything to Jackson other than "let me go." But Jackson testified (on recross-examination by defense counsel) that from what he saw on the surveillance footage, "it look[ed] like" defendant was "tugging on" Jackson's "pants pocket," "trying to pull something out of [his] pocket."

The young woman who asked Jackson to help her that day was defendant's girlfriend, and she testified for the defense at trial. She explained that though defendant "was going to rehab" at the time, he "took a lot of" Xanax pills when he woke up on the day of the incident. She and defendant were arguing about this in her parked Land Rover when she ran away, taking her purse with the keys to the vehicle with her. Defendant ran after her. Defendant "wasn't acting right and [the woman] was scared," so the woman ran to the fast-food restaurant where Jackson was sitting outside.

When defendant and Jackson began struggling, the woman "went around the building" to ask for help. She did not pick up a wallet. Nor did she and defendant plan to rob anyone.

A September 2020 amended information charged defendant with second degree robbery, and alleged a prior serious felony conviction.

In closing argument, the prosecutor explained that before he heard defendant's girlfriend testify, he suspected "maybe this [was] kind of a setup," but after her

3

testimony, he believed defendant "didn't intend to commit a robbery prior to attacking . . . Jackson. But . . . formed that intent during . . . the attack itself."

Defense counsel argued the "case boil[ed] down to . . . intent." "If [defendant] did steal" Jackson's wallet, "when did that actually happen?" The video did not show when (if at all) defendant obtained Jackson's wallet, counsel argued. Counsel urged the jury not to "rely on circumstantial evidence of the video . . . to essentially say that . . . you . . . see . . . [defendant] with his right hand . . . taking a wallet" from Jackson's front left pants pocket as the two men struggled on the ground. "[I]t is the defense's position," counsel argued, that Jackson's wallet "was picked up at some point *after*" the physical struggle; perhaps when defendant returned to the restaurant's front-door tent area, minutes later.

Defense counsel also urged the jury to consider the impact of defendant's voluntary intoxication on the case. "[S]omeone who is that intoxicated does not have the intent to permanently deprive [an] owner . . . of his wallet," he argued.

The jury found defendant guilty of the robbery, and found "true" the prior serious felony allegation. In January 2021, the trial court sentenced defendant to 11 years imprisonment, composed of six years for the robbery (the middle term of three years, doubled pursuant to § 667, subd. (e) and § 1170.12, subd. (c)) plus a five-year term for the prior serious felony (§ 667, subd. (a)).

Defendant timely appealed.

DISCUSSION

I

Defendant contends there is insufficient evidence for his robbery conviction. We disagree.

" ' "In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' [Citation.] We presume in

4

support of the judgment the existence of every fact that could reasonably be deduced from the evidence. [Citation.] We reverse for lack of substantial evidence only if ' "upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." [Citation.]' " (*People v. Mullins* (2018) 19 Cal.App.5th 594, 601-602 (*Mullins*).)

" 'Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear.' (Pen. Code, § 211.)" (*Mullins, supra*, 19 Cal.App.5th at p. 602.) "This element is cast in the alternative; it may be accomplished either by force or by fear." (*Id.* at p. 604.) " 'The intent to steal must be formed either before *or during* the commission of the act of force.' " (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 166, italics added.)

Defendant argues that *Mullins* supports his position, because in that case, a panel of this court explained that the force necessary for robbery "need only be sufficient to overcome the victim's resistance," (*Mullins, supra*, 19 Cal.App.5th at p. 604) and here "the only 'resistance' by . . . Jackson was not that of attempting to retain possession of his wallet. Rather, it was merely" to prevent defendant from "strik[ing] [him] again." We are not persuaded.

In *Mullins*, the panel affirmed a robbery conviction because the facts supporting it established "both force and fear," where the victim "was nudged or shoved away from [an] ATM" "at various times" by the defendant, who "touched [the victim's] arm, cut in front of him, and prevented him from pushing the button to prevent another transaction from occurring. This force was sufficient to overcome [the victim's] resistance," we explained. (*Mullins, supra*, 19 Cal.App.5th at p. 604.) But *Mullins* does not stand for the proposition that the *only* way that force is cognizable for purposes of robbery is when it is used to overcome a victim's resistance.

Invoking *People v. Prieto* (1993) 15 Cal.App.4th 210, defendant contends the mere presence of "force or fear" *when* property is taken " 'is not enough' " for robbery, as the "force or fear" element of robbery " 'must be *the means* by which the taking was accomplished.' " (*Id.* at p. 215, italics added.) And, defendant argues, Jackson's belief that the wallet fell out of his pocket "negates any notion that he was prevented" by force or fear from keeping his wallet, or that he resisted defendant *because he knew* he was being robbed.

But we see no reason why the felonious taking of personal property cannot be "accomplished by means of force" even when the victim is ignorant of the taking. In *U.S. v. Reynolds* (C.M.A. 1985) 20 M.J. 118, the United States Court of Military Appeals affirmed a robbery adjudication where the perpetrator "played the role of a military policeman," " 'patted' the victim down in the manner of a military policeman effecting an apprehension," and "lift[ed] the victim's wallet, remove[d] $80.00, and return[ed] the wallet to the victim's pocket, without the victim's ever realizing that it had been removed." (*Id.* at p. 119.)

Citing decisions from multiple states, the appellate court rejected the argument "that the 'patting' . . . was insufficient 'force and violence' to constitute robbery," explaining: "the jostling of a victim by a pickpocket . . . for the purpose of *diverting the victim's attention* can constitute sufficient force to make out robbery. [Citations.] [¶] Here, the force exerted . . . obviously went beyond that needed simply to lift and remove the property, because the victim suddenly found himself stretched out on an automobile and being gone over in the manner of one under apprehension. Moreover, the 'patting' was specifically *designed to divert the victim's attention from his wallet*, so as to prevent its removal being noticed." (*U.S. v. Reynolds, supra*, 20 M.J. at pp. 119-121, italics added.) We find this analysis of cognizable "force" for robbery persuasive.

Here, Jackson's testimony and surveillance video footage showed that defendant and Jackson scuffled for about 30 seconds, as defendant pressed Jackson's head/neck to

6

the ground with his left hand.  Defendant's right hand is obscured in the video.  But it appears to be close to Jackson's front left pants pocket, where Jackson was keeping his wallet on the day of the incident.  After the scuffle, defendant walked to his girlfriend's truck and got in.  Jackson's wallet was found inside the truck.

Viewing this evidence in the light most favorable to the judgment, we conclude a reasonable trier of fact could find defendant guilty of robbery beyond a reasonable doubt, because the jury could have concluded (and the prosecutor's theory was not inconsistent with the notion) that—after he struck Jackson in the head, but *during* the 30-second struggle on the ground—defendant formed the intent to take Jackson's wallet and used force (pressing Jackson's head to the ground with one hand) to divert Jackson's attention from the extraction of his wallet from his pants pocket (with the other right hand).

## II

Defendant next claims the trial court misread CALCRIM No. 376, Possession of Recently Stolen Property as Evidence of a Crime, thereby "lower[ing] the People's burden of proof and allow[ing] the jurors to find [defendant] guilty . . . on a legally erroneous theory."  The People argue the misreading was harmless error, because the jurors received proper written instructions.  We agree with the People.

A.  *Additional background*

When the trial court instructed the jurors, it provided a written copy of the instructions to the jurors, explaining that it would "read to" the jurors from the "packet" of "closing instructions" that was "a duplicate of" the instructions the jurors received.  "[Y]ou can actually read the instructions with me, flip through them.  It's an invitation to read them, but it's [an] obligation to listen to them," the trial court said.  "You will take these packets with you to the deliberation room and hang onto them."

In relevant part, CALCRIM No. 376 provides:  "If you conclude that the defendant knew (he/she) possessed property and you conclude that the property had in fact been recently (stolen/extorted), you *may not* convict the defendant of <insert crime>

7

based on those facts alone.  However, if you also find that supporting evidence tends to prove (his/her) guilt, then you may conclude that the evidence is sufficient to prove (he/she) committed <insert crime>."  (Italics added.)

But the trial court misread the instruction, telling the jury it *could* convict the defendant of robbery if it concluded he knew he possessed property that recently had been stolen.  Defendant did not object.

Later, the trial court announced a "correction" to a different instruction.  "[G]o back in your instructions to . . . page six . . .  I'll give you a second to get there."  The trial court explained that a "paragraph" in an instruction provided previously "shouldn't be in there," and the trial court "didn't want it to create any confusion" by allowing the paragraph to remain in the packet.  "I'm going to re-read [the instruction] to you, without" the extraneous paragraph, the trial court explained to the jury.  "And then what we'll do is . . . when you take your break, I'll have you leave your packet behind and we'll substitute the[ ] . . . corrected instructions into your packet, so all of you are fully updated as to all changes, and you'll be good to go."

Just before the trial court sent the jury to begin deliberations, it instructed them, "please grab your notebooks, grab your instruction packets and . . . follow" the courtroom deputy to the deliberation room.

B.  *Discussion*

Misreading of jury instructions is at most harmless error when the written instructions received by the jury are correct.  (*People v. Osband* (1996) 13 Cal.4th 622, 687; *People v. Garceau* (1993) 6 Cal.4th 140, 189.)

Defendant endeavors to distinguish *People v. Osband* and *People v. Garceau* as "capital cases . . . involv[ing] . . . deliberations which may last days, even weeks, thus providing [jurors] with ample time to request clarification on any discrepancies between" written and oral instructions, whereas in the instant case, the jury deliberated "for less than two hours."  We are not persuaded.  The rule announced by our Supreme Court is

8

clear, and does not depend on facts not present here. We must follow that rule. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Accordingly, we conclude the trial court's misreading was harmless error, as the jury likely disregarded the trial court's misstatement and focused on whether defendant committed the charged crimes based on the evidence presented at trial and the written instructions. (See *People v. Rodriguez* (2000) 77 Cal.App.4th 1101, 1112-1113 [where there is a discrepancy between the oral instructions and written instructions, we presume the jury followed the written instructions].)

Defendant argues the trial court's direction to the jurors that they had the *option to read* the instructions, but they were *obliged to listen* to the trial court's oral recitation of the instructions, supports the notion that "at least some of the jurors followed the [trial] court's" misreading of CALCRIM No. 376, "rather than the written version [of the instruction] in their packets." In light of the record, we disagree.

The trial court clearly indicated to the jurors that the written instructions were important and were to be considered during deliberations, as evidenced by (a) the trial court's directions (both at the beginning and the end of closing instructions) to the jurors to take their instruction packets with them into deliberations, and (b) the trial court's explanation to the jurors regarding a "correction" (and physical replacement) of a portion of an instruction in the jurors' packets, after earlier provision of extraneous, and possibly confusing, language in that instruction.

### III

Defendant's third claim is that the trial court erred by instructing the jury with CALCRIM No. 372, Defendant's Flight, because there was insufficient evidence for the instruction. We disagree.

A. *Additional background*

The trial court decided to provide CALCRIM No. 372 to the jury because, as it explained to defense counsel (who objected to the instruction), defendant "was there at

9

the tented area.  He left. . . .  Came back, kicked on the door again, left again, but he is arrested in a portion of the parking lot that is not immediately adjacent to the area where this incident occurred.  And the movement from point A to the point of arrest, particularly given the distance, I think is sufficient for 372.”

The trial court instructed the jury:  “If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt.  If you conclude that the defendant fled, it’s up to you to decide the meaning and importance of that conduct; however, evidence that the defendant fled cannot prove guilt by itself.”

In rebuttal closing argument, the prosecutor posited that defendant’s return to the restaurant minutes after attacking Jackson “[didn’t] mean [defendant was] intoxicated to the point that he’s just acting crazy.”  Rather, it was consistent with the notion defendant was looking for his girlfriend, who was “his way out of there,” because she had the keys to her car.  “He’s trying to get in the door, because he thinks she’s in there with the keys.”

B.  *Discussion*

We review de novo defendant’s claim of instructional error, and ask whether substantial evidence in the record supports the instruction.  (*People v. Waidla* (2000) 22 Cal.4th 690, 733; *People v. Ross* (2007) 155 Cal.App.4th 1033, 1052.)

“A party is entitled to a requested instruction if it is supported by substantial evidence.”  (*People v. Ross, supra*, 155 Cal.App.4th at p. 1049.)  Evidence is substantial in this context if it reasonably permits the jury to find that the facts underlying the instruction existed.  (*Id.* at pp. 1049-1050.)

Defendant argues the trial court erred by instructing the jury with CALCRIM No. 372, because *after* Jackson “released him”—and defendant moved to “an area of the parking lot which was not shown on the surveillance video”—defendant *returned* “to the tent area” and “began kicking on the door of” the restaurant.  Those actions “reasonably evinced the lack of knowledge that . . . Jackson’s wallet was missing.”  Thus, defendant’s “ ‘mere departure from the scene’ ” was not necessarily “ ‘deliberate flight.’ ”

10

Here, the jury could have inferred that when Jackson saw defendant get in his girlfriend's vehicle, defendant intended to flee the scene in the vehicle because he was aware he was guilty of robbery. And, as the prosecutor suggested in rebuttal closing argument, the jury further could have inferred that defendant returned to the restaurant and pulled at and kicked the front door because he was looking for his girlfriend, who had the car keys that he believed were necessary for an effective flight from the scene. That the jury *also* could have attributed a relatively innocent explanation to defendant's conduct does not render the evidence insubstantial. (Cf. *People v. Wallace* (2008) 44 Cal.4th 1032, 1078 ["that the evidence also could suggest" a relatively innocent explanation, "does not render the evidence insufficient" for a rational jury to find true the less innocent explanation].)

Accordingly, this claim lacks merit.[2]

IV

Here, the trial court imposed the middle term for robbery in January 2021.

But Assembly Bill 124 amended section 1170, adding paragraph (6) to subdivision (b). This paragraph provides: "Notwithstanding paragraph (1), and *unless the court finds* that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court *shall order imposition of the lower term* if any of the following was a contributing factor in the commission of the offense: [¶] (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence. [¶] (B) *The person is a youth*, or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense. [¶] (C) Prior to the instant offense, or at the time of the commission of the offense, the person is or was a

---

[2] Because the trial court did not err, defendant's due process argument—premised upon ostensible trial court error vis-à-vis the provision of CALCRIM No. 372—lacks merit.

11

victim of intimate partner violence or human trafficking." (§ 1170, subd. (b)(6), italics added.)

Section 1016.7, subdivision (b) provides: "A 'youth' for purposes of this section includes any person under 26 years of age on the date the offense was committed."

As defendant was born in July 1995, he was under 26 years old in April 2020, and therefore he was a "youth" for purposes of section 11170, subdivision (b)(6).

The People concede this change in the law is ameliorative and applies retroactively to defendant's case, requiring remand for resentencing. (See *Estrada, supra*, 63 Cal.2d 740.) We accept the concession and order the appropriate remand.

DISPOSITION

The conviction is affirmed. The sentence imposed is vacated, and the matter is remanded for resentencing.

/s/
RAYE, P. J.

We concur:


/s/
HULL, J.


/s/
KRAUSE, J.

12